I call the case of Kisano Trade v. Lemster Steel Equipment, Sapir and others. Mr. Marks. Good morning Judge Fuentes. I'm here with Maria Chomkin from my office and to please the court I would like to reserve five minutes for rebuttal. Yes. Your Honor, a form not convened is an extraordinary remedy which should only be rarely granted. We have argued in our brief and I'll argue today that this decision of the district court was flawed in every respect. Neither magistrate judge in his recommendation nor the district court in her opinion ever found that there was vexation or oppression that would cause the defendant to try this case. The court never found that the private interest factors imposed vexation or oppression. The court never found that the public interest factors heavily favored dismissal and the court never found that the balance of these factors imposed vexation. One of the parties, one of the parties had a, if I remember correctly, a medical problem that was documented by medical reports that would have created a vexatious. Your Honor, it took 30 seconds less than more than I thought to get to that. I'm happy to address it. The burden of proof was on the defendant to establish that he had a medical problem with admissible evidence that prevented him from traveling. Admissible evidence do you mean like in a trial or do you mean evidence that has some some basis in fact or some credence for the judge to consider? I mean, Your Honor, when I'm not aware of any decision of this court or any other circuit court that says when you have a disputed issue of fact, the parties can establish that without compliance with the federal rules. Well, the magistrate judge, who your opening sentence or two aside, I think did a very thorough job here, did not conclusively decide that issue. Absolutely. Rather, he found that the public factors weighed heavily against you. Well, he didn't, number one, he didn't say that they weighed heavily. He didn't say they weighed heavily. Well, he has to balance them under, he has to balance them. He has to, Your Honor, but my point... He did. He didn't say they weighed heavily and he didn't say they applied vexation or oppression and the district... He applied the vexatious standard without using the words and the district judge specifically did. If I could just go back, I'll answer that. So, Judge Puentes, to answer your question, okay, I think the magistrate judge never concluded that Mr. Sapir could not come here to testify and there was no way on that record either he and the district court didn't either and there's no way on this record they could have concluded it because we submitted two expert reports, one from an American expert and one from an Israeli expert, who examined him in Israel and concluded that he could travel. They examined the medical records, they examined him, and their uncontroverted expert opinions were that he could travel to the United States. So there's a conflict, apparently, in the information presented to the magistrate judge. And to the district court, of course. There's no doubt that there was a conflict. There was never a hearing. They never submitted an expert report. They submitted, in their motion, okay, performed on, they submitted an unverified letter of Dr. Lubashitz, which would not be admissible evidence. The only time they submitted something that was verified was in their reply, but he's not an expert. He was the treating physician. They wouldn't produce him for He can't get expert testimony in through a layperson. We cited the cases to that. You don't allow a wolf to come in through sheep's clothing. So therefore, in our view, because the courts never found that he couldn't come, they couldn't find that because there was a dispute, they had no hearing, and he had no admissible evidence, it's a non-issue. Your Honor, I understand that the court stated what the standard is, but neither the trial court, neither the district court, nor the magistrate ever made the finding that there was vexation or oppression, or, and in fact, the district court said that you don't have to find that the public interest factors heavily favor. Heavily favor. There's a balancing of the public and the private. But let's look at this. The burden on our deference, okay? Mr. Shulman, under the treaty, is entitled to be treated as an immigrant. That's what you say. And that's all you hang your hat on in terms of the deference that he, that is afforded because he is a foreign plaintiff. You want him treated as if he were an American on foreign soil. The only thing you invoke is the American-Israeli treaty and the equal access provision, correct? Absolutely incorrect. All right. You do invoke that. I do invoke it. We think it would be dispositive because the treaty is the law of the land, and we believe under the treaty he has to be treated as an American. If we reject that, and if we go back to Piper Aircraft from the Supreme Court of the United States, which says that a foreign plaintiff is accorded less deference. Well, actually the Third Amendment says that word. It's when you don't like foreigners. It's in the opinion. Xenophobic. Xenophobic, okay? That it's not based out of xenophobia. So what we said, let's look why we filed here. Why did we file here? Don't forget, the first complaint before we amended it was only against Mr. Lemster and his company, who are based in the Western District of Pennsylvania. There was no basis to sue them in Israel. Loney and Lacey say if you sue where the defendant is located and you can't get jurisdiction over him anywhere else, that shows you filed here for convenience. Can I follow up on this point that Mr. Barry was making? Because Piper Aircraft did say that the plaintiff's choice of forum is entitled to deference when the plaintiff has chosen the home forum. So that it seems like it is residency rather than citizenship that is given the greater deference. Under the treaty, he would be treated as a non-resident American. He would be entitled to deference under a treaty because, if given a choice, most Americans would... You hope. I hope. You hope. I agree, Your Honor. It's your, it's a, it's, listen, I understand it's an issue of first impression and a circuit. Absolutely. I'm not sure that your Second Circuit case, Blanco to Blanco... Yeah. ...is worth very much anymore. In any event, what it said in that case was only dicta. I don't think it was dicta, Your Honor. Read it again. I'm not deciding the case. But I do think that... Mr. Schuman... We made a decision that, when the U.S. entered into that treaty, that he was entitled to equal access. That's how I read the treaty. But a plaintiff entitled to equal access, though... Yeah. ...would nevertheless be subject to a forum non-convening in motion. No doubt about it, Your Honor, but he's still... It doesn't, like, guarantee him that he can, he has the access, but then what happens after he has the access is just like a citizen. There's no doubt, there's no guarantees in life, but what he's entitled to is deference. But to go back to your point, Judge Barry, we... And when you look at Loney and Lacey, you say, why did they file... Why did he file here? Why did he file here? Because the defendant was located here. Why did he file here? Because the acts of fraud, Your Honor knows this from the injunction proceeding, took place here. The five fraudulent faxes that Mr. Sapir sent... Well, that's not... ...came from here. Really, that's your spin on it. It seems to me that certainly the allegation, and it seems to have some support to it, is that all the preliminaries, most of the... With the exception of the wire transfers and a couple of things, everything took place in Israel. That's not true, Your Honor. Mr. Sapir submitted declarations that he came here to inspect the equipment. All of our communications with Mr. Lemster and his company took place while they were in Pittsburgh. Pennsylvania. You're dealing here with a company in Ohio, I think one in California, New York Real Estate. By the way, there's a settlement agreement in that case which is relevant to this case because the New York Real Estate transaction is all over this case that says all future proceedings, any dispute goes to Israel under Israeli law. Then you've got West Virginia, which is an interesting thing given that motion to dismiss and what Shulman said in that case. You have companies all over the country, essentially. That's an exaggeration to be sure. Very little. Well, hold on, Your Honor. We've argued, okay, and I believe that the Third Circuit case, it's cited in the brief, you look to the United States as the forum, not the Western District of Pennsylvania. And all of the actions here, the fraud related to the plant in Warren came out of Pittsburgh because it was the law firm in Pittsburgh and that's where Mr. Shapir went to send the fraudulent faxes. The coal was purchased from West Virginia. There were two transactions related to coal. The Viola fraud took place in Ohio. All of the actual conduct, all of our evidence was in English, all of our documents were in English, all of our, we had five or six main witnesses that were here. We filed here for convenience. We didn't file here to impose vexation on Mr. Shapir. Convenience is for our purposes because what we have before us is the motion to dismiss on forum grounds. I understand that. The key, as all of the cases now say, is to look at the convenience. And that is where you have to go in. And as we argued, where else would we have filed it? There was no basis to sue Mr. Lemster and his company in Israel. They had nothing to do with it. But nobody's here. What do you mean nobody? Excuse me, Your Honor. Mr. Lemster is here. His company is here. Our witness is here. And Mr. Shapir did not contest personal jurisdiction. You have a Maltese company. You have a Cypriot company. You've got an Israeli citizen, Mr. Shulman, in Israel. Well, I think you say in your reply brief you're going to get in the mother of Mr. Shapir, who's taking care of the sick father. He can't come in. And the caretaker for the cerebral palsy son. And you're going to do videos of those who can't. But they don't speak English. So I don't understand the convenience argument myself. The issue is, when you look at our deference, the issue is why did we file here? Those aren't our witnesses. We filed here because our defendants were here. Our witnesses were there. They're not our witnesses. We don't believe, as Mr. Shulman said, you never talk to them about business. But our defendants are here. That's disputed. Well, but you're asking, look at the plaintiffs. Why did the plaintiffs file here? There were our witnesses in Israel, aren't there? I mean, not all the witnesses are in Pennsylvania or on this side of the ocean. The witnesses are in different places, Your Honor. There are two witnesses here. There are witnesses in Malta and Ukraine. That's a good point because I think that's what the judge was taking into account, that there are witnesses, yes, in Pennsylvania. It's actually a horrible point because the witnesses in Malta and Ukraine are no more subject to testifying in Israel than here. So it favored neither side. Could you touch on it because I know your time is up. I'll stay as long. Okay. You can touch on this then, which is the standard of review, which is very, very deferential. So that you have to show that there was an abuse of discretion on the judge's part. Which may constitute an error of law. And the errors of law, which I'll summarize with this, that took place were, number one, on the treaty. Number two, the judge treated the only relevant form as the Western District of Pennsylvania when it's clear that the relevant form is the United States as a whole. So the fact that transactions took place in West Virginia or Ohio was irrelevant when we sued in Pennsylvania because the defendant was located there. One last point on the treaty that I wanted to ask you about. I really don't understand your take on the treaty. So that treaty means that U.S. courts have to give foreigners more deference. Same deference. Same deference as if that person were a U.S. citizen. Even though that person is a foreigner, choosing a non-residential court. The case law and argument is that the court is required under the treaty to give the foreign plaintiff the same deference that it would give to a U.S. citizen residing wherever the foreign plaintiff resides. That treaty is not especially for U.S.-Israeli relationships, but those kinds of treaties, I would imagine, exist for other nationals as well. Would that be accurate? No doubt about it, Your Honor. And it's up to the executive with the approval of the Senate to make those foreign policy determinations whether we want to forward the foreign policy of the United States by providing equal access to the foreign citizens. And don't forget, they have to do the same thing for us. But to go back to the... Just to finish up on that point. Assuming we find that the Second Circuit does not stand for what you said it does in this connection, this would be the first case in the country, wouldn't it, to decide that issue? There's only, to our knowledge, Your Honor, the only circuit that has considered the treaty is the Second Circuit. That's my understanding, too. Yes, but Your Honor, so we would say that you would have to give the same deference to an American living in Monaco. Why would that American living in Monaco file in the United States? Well, with the transactions don't take place in the United States, that makes a lot of sense. The other errors of law... You do have treble damages here in Rico, too, don't you? The district judge made no such finding that that was the motivation. And it wasn't the motivation. The fact that he shouldn't get bonus points for committing racketeering. Don't forget, he never moved to dismiss the racketeering claims. Mr. Lemster moved to dismiss the racketeering claims. His motion to dismiss was denied. As we sit here today, we have valid Rico claims. Well, there is a pending motion to dismiss. Not the Rico claims. Not the Rico claims. Well, actually, there was a motion to dismiss. I stand corrected. Mr. Shulman's Rico claim. There was no motion to dismiss the Rico claims of the other two plaintiffs. I apologize. The other errors of law, just because I do want to sit down, but I want to say what they are. Public policy, on the public interest factors. The court never gave us... There was no public interest factor that favored dismissal. And what the court ignored is that the American law would govern. There's no issue of the court having decided, having to decide complicated issues of Israeli law. There's no doubt American law applies to the claims against Mr. Lemster and his company. They're based in Pittsburgh. Mr. Sapir did not challenge in his motion to dismiss that American law wouldn't apply. His expert opinion on... Sotomayor's New York law applies. No, New York. That had to do with real estate. But we're not making claims under the real estate. Pennsylvania laws apply. Your Honor, you can take a look at the briefs and the decision below. Pennsylvania law, we allege that Pennsylvania law applied to all of the claims, and that was not challenged. That was the only public interest factor you would think that... She made an error of law. Look, your case is... I just had one. Say she has to look at that. Any difficulty in getting jurisdiction over all the original defendants in Israel? There's no evidence whatsoever that we could have sued them in Israel. Now... But they've consented to do it. Consented. But they've consented to do it. As of now. He's consented, which is reverse form shopping, and it's worse. Why would Mr. Lemster want to go to Israel unless he thought it would make it more difficult for us to prove our cases because our key witnesses with whom he had secret agreements are here and that we can't bring them to Israel to testify? Brilliant move. And that's why he wants to do it. He wants to make it harder for us. It's a two-way street. He may have some difficulty getting his witnesses here. We have key witnesses that he did the secret deals with, okay, or that he said that he paid $500,000 that he never did. We want to be able to present those witnesses at trial live, and they're all within the subpoena power of the court, so the trier of fact can hear that despite Mr. Pierce's protestations that we agreed, my client agreed to pay him these, you know, millions and millions of dollars for doing nothing, that he was deceiving my client. Do you know if the Second Circuit took into account the Equal Access Treaty in its Pollack's decision? One. Pollack's holding versus Chasem Hatton. Your Honor, the decision that we cited, and let me just look at my note here. I have it right here. Blanco v. Blanco. Your Honor, Blanco v. Blanco was the equal treatment. Pollack's is what I was alluding to. That's Equal Access. Pollack's took Blanco to the cleaners. It was a different treaty, Your Honor. It's Equal Access. The Equal Treatment, listen, there are different types of treaties. Equal Treatment, okay, is different than Equal Access, and the cases in our brief cite that. The treaty that we have with Israel is the most favorable treaty that you can have, and the Second Circuit said that requires Israel, requires the United States to treat Israelis as Americans, and co-committantly Israel would be required to treat Americans as Americans. We'll get you back on it.  Thank you, Mr. Marks. Mr. Elliott. Good morning. May it please the Court, my name is Larry Elliott, and I'm here with David Russi on behalf of Mr. Sapir. I'd like to reserve three minutes for rebuttal. Oh, I can't do that. Yes, sir. What am I thinking? I'm used to being on the other side. We'd like to. Well, then just stipulate that he won. I shan't. I shan't. Then you can have rebuttal. The purpose of being here today is not to rehash the facts and go over the facts. We're here to look at whether the court below properly applied the test and reached the conclusions to determine that the form was inconvenient. In order to overturn that decision, you have to show a clear abuse of discretion, as this Court has already recognized. You have to show that the court below considered all factors, all proper factors, all relevant factors, and did the balancing in a reasonable fashion. If that is the case, then the decision is entitled to substantial deference. The appellate court doesn't substitute its judgment for that of the district court. And what happened here? First, they determined there was an alternate adequate forum in Israel. It's not even challenged. Is there a jury trial in Israel? I don't know the answer to that, Your Honor. It is a parliamentary system based on the British system in Israel, but I don't think they have jury trials in civil cases. I don't believe so. Let me ask you about a comment that's made in this Povich holding case, Povich v. Chase Manhattan. It's a Second Circuit case, 2003. And the statement made in that case is that when a foreign plaintiff sues in a United States forum, such choice is entitled to less deference because one may not easily presume the choice is convenient. Of course, that statement helps you quite a bit. But put up against that the treaty, the Equal Access Treaty. Your Honor. That Mr. Shuman is an Israeli citizen and is entitled to equal access, and so that this language really would not apply to him. The language of the treaty is not important to the decision of deference other than to make Mr. Shuman the equivalent of an American who would be living abroad and bringing a case here, which in that situation, the courts have consistently applied lesser deference than to an American who is a resident in the forum. The Equal Access Treaty is a treaty between Israel and the United States. Correct. I mean, doesn't it give Israelis the same deference as an American suing in an American court? First of all, the Povich case questions that, and the Southern District. Does it actually question the Equal Access Treaty? It does. Well, it doesn't question the treaty. It questions the treatment that had been suggested as dicta. Judge Berry correctly points out, and the Southern District cases that have looked at these cases since, and they were not cited in our brief, and I apologize for that, but I went back and looked at the Southern District cases to see if they were following the Blanco case, and they are not. They have universally rejected it because, first, it was dicta. In the Blanco case, when they were looking at the treaty, they still found that the forum was inconvenient. Now, our court has never addressed the effect of this treaty again. They have not, Your Honor. And the Pollux case then criticized the decision in Blanco, although the issue was a little different in the Pollux case. It was Equal Access, not the treaty itself. But there are two cases. There's an NRA air crash case, which is the Southern District of New York, and they've reached the conclusion that the treaty does not elevate your status for forum nonconvenience purposes. You would be treated the same as an American who was living abroad and picked a forum in the United States, which would be lesser deference. And the case of – Well, that's the same deference as if you were not an American living abroad. Well, that's true. So what does the treaty do for you? Well, the treaty treats you just like you were an American, basically. It treats you – if I'm living in France and I bring an action in the Western District of Pennsylvania and my residency is France, I'm entitled to lesser deference as an American. And that's the same thing here. Otherwise, you're elevating – the treaty would elevate an Israeli citizen and give them more rights than an American citizen for this issue. Whatever the deference, whatever – whether it's the same, lesser, or low – and I don't know if there's a difference between lesser and low. It seems that those words are used interchangeably here. I see a difference, but – by the way, parenthetically, do you think it's lesser deference or low deference as a phrase? I believe it's lesser deference. And that's the term that I believe the judge used. They use both. But whatever – whether it's lesser, whether it's the same – forum nonconvenience is convenience, is the key. It is correct. That is absolutely correct. That should really, I think, at this point, be the focus. And the focus – the court properly went through the steps of determining that focus. A couple of things. The two main players here, Mr. Shulman and Mr. Sapir, are both Israeli citizens. Most of the contested witnesses – 90 percent of the contested witnesses, not the witnesses who in the past dealt with some of these deals and they appeared in other lawsuits. Their testimony is not – basically not disputed. There are few Americans involved in that. But the other testimony that will come will come from the Ukraine, it will come from Malta, it will come from Cyprus, it will come from Monaco, it will come from Israel. And we presented affidavits, we presented statements, and we listed what that evidence would show. You don't have to do it in great detail for a forum nonconvenience. We did it in broad terms as required under the standards. The standard here is not the standard of proof you would have in a motion to dismiss or a motion for summary judgment. Do you think the court should consider the relationship between the causes of action and the jurisdiction in which the case is filed? The court – When you read through this, almost everything happened in Pennsylvania. The only thing – The purchase of property was in Pennsylvania. That was actually in Ohio, Your Honor. Oh, it was in Ohio? Yes. What happened to Pennsylvania? There were two – How did we get the case? There were two or three wire transfers that moved through Mr. Limster's account and were then passed on to Switzerland into Mr. Sapir's account. They were a purchase of two companies, is that correct? There was a purchase of a company in Ohio out of the bankruptcy courts. Okay. And the funds for that flowed into Mr. Limster's account because he helped – And where was his office?  Mr. Limster's office was in Pennsylvania. But the deal was done in Ohio. And there was a purchase of property in New York City that was also supposed to – That was in the past. That purchase of that property was handled in New York and – I understand that, but it's all part of this case. Well, he included that as a part of his RICO acts. It's not really – he's not claiming any damages resulting from that. It just seems to me that all of the circumstances that created the cause of action occurred on this side of the ocean. That's not so. What we presented, the agency agreement, which is at the heart of this, was entered into in Israel. The nondisclosure, to the extent there were any nondisclosures, would have occurred in Israel or Monaco or the Ukraine. The coal deals, which are part of this, which were deals of coal from West Virginia being sent to the Ukraine, with some payment being made to Mr. Limster's account in Pennsylvania, but otherwise completely outside of Pennsylvania. Those deals were negotiated in the Ukraine or in West Virginia. When Plaintiff filed this action, I mean it appeared that Plaintiff did not have personal jurisdiction in Israel. So it seems that Plaintiff proceeded on a good faith basis that everybody involved in this case should be brought into the court in the Western District of Pennsylvania. The only evidence that's of record is we submitted affidavits from an Israeli lawyer who said that Israel could have brought Mr. Limster and his company into this case in Israel. There is another case pending in Israel, which arises out of the same facts, and the lawyers in Israel said that Mr. Limster could have been brought in, but that's of no import now because Mr. Limster, and as the magistrate judge insisted, he said, I'm not going to dismiss this case if he's going to lose one of his defendants. And so Mr. Limster agreed to waive the statute of limitations. This is exactly what happened in the Wendt case and the Eurofins case in the Third Circuit. There's nothing wrong with this. A minor party in the case decided that he would submit to Israeli, but we submitted evidence that he would have been subject to Israeli law and a summons to come to Israel anyway. This is really, at bottom, a case between Shulman and Sapir, isn't it? It is. It is. Mr. Limster helped locate and facilitate some of the deals. He worked with Mr. Sapir, since Mr. Sapir is not located in the United States, and his bank accounts were used because he had a bank account and they needed to put the money somewhere before it went to Switzerland. And Mr. Shulman, as I understand what happened in West Virginia when he moved to dismiss for lack of personal jurisdiction over him there, he said he doesn't do business in West Virginia and it would be an unfair burden for him to litigate in a foreign country in a language that he doesn't know or something like that. That is correct. So that when he appeared in West Virginia, which is a hundred miles from the Western District of Pennsylvania, it was inconvenient. It was not a good forum for him. But he moved to dismiss him personally. Yes, he did. Alleging, you know, lack of convenience because of the language barrier. Correct. As well as the fact that he was in West Virginia. And because of the fact he would have had to travel to West Virginia, which is basically traveling to Pennsylvania. I mean, there was a problem with the language, too. Absolutely. He doesn't speak English. Absolutely. My understanding is he does not speak English. He also, when there was a dispute in New York, entered into an agreement that made Israel the forum for a dispute between him and Mr. Sapir. So, you know, this idea of coming into Western Pennsylvania is, you know, the court below didn't find there was forum shopping. On the other hand, it smacks of forum shopping. Well, his former lawyers were located in Pittsburgh, too. The lawyers that papered the deal for the Ohio purchase were located in Pittsburgh. That's correct. And they've been listed as witnesses, although what they did is not really subject to any dispute. A couple of other things. I do want to address the physical problem that Mr. Sapir has, and I want to put it in context. Mr. Sapir, before this lawsuit was ever filed against him, had an incident after a long flight. And it's a life-threatening, deep vein thrombosis can be life-threatening. At that point, the court, not the court, the judge looked at the facts, and the judge found that, or looked at facts, showing that his doctor limited him to short flights. He tried a short flight. He had another incidence of deep vein thrombosis. Was his medical condition and his travel restrictions reduced to a medical report or an expert report of some sort? Not an expert report, Your Honor. He was seen by a specialist who, in Israel, the doctors are government employees. Well, the judge did take that factor into account. He did. In its nonconvenience analysis. He did, and he bent over. I wanted you to go over to Mr. Marks' point that this evidence was not admissible evidence. It should not have been considered. That's exactly where I was going. What happened here is that, first, an affidavit by Mr. Sapir, who testified, I'm under doctor's orders, which would be perfectly admissible, by the way. I'm under doctor's orders not to fly for one year. Submitted it in the form of an affidavit, just like you normally would with a form nonconvenient. After that, Mr. Marks asked for additional evidence. He asked for the medical records. We had a conference with the judge. The magistrate judge said, all right, give him the medical records. We went over, talked to the doctor, got the medical records, or rather, Sapir got the medical records, sent them, and presented them, just like the court asked. Mr. Marks was not satisfied with that. Then he asked, we want a statement from the doctor. The court, after we had another argument, the court said, all right, I want a statement. Then the doctor gave an unsworn statement. At that point, they still weren't satisfied. They asked the court, we want to examine him in Israel. So they sent their doctor to examine him in Israel. He did a 60-second physical exam, and he talked to Mr. Sapir's other doctor. Then he comes back to the states, and they file a, quote, expert report, based on a 60-second exam, and a person who never examined Mr. Sapir. It was then that his doctor in Israel was offended because they were challenging that he sent in a sworn statement at that point, and he laid out what he had done. So this idea of admissible, first of all, evidence in forum nonconvenient is not required to be admissible, but the evidence was a sworn statement from his treating physician, not an expert, from his treating physician, as to what I did, what I diagnosed, and what I told him not to do, and that is travel to the United States. Well, the magistrate judge used the word conclusively. He said, I do not conclusively resolve the issue of his physical condition and his ability to travel because of the competing submissions. What he did was decide the private, the other private factors. Correct. Instead. That is correct, Your Honor. He finally threw up his hands because there was a constant request for more evidence, more evidence, more evidence, and he said, it doesn't matter because the other factors are so overwhelming, and that question of did he conclude that they were overwhelming, well, what he said, what he said was, this is a stronger case for form non-convenience dismissal than the Kimmitt case. He also concluded, this dispute represents an even stronger case for form non-convenience dismissal than your offense. So the idea that he didn't conclude that this was vexatious and oppressive is just not correct.  I mean, did he say that? He didn't write a sentence, I therefore find vexatious and oppressive, but he said, this is a strong, he correctly laid out the standard, he applied the standard in a step-by-step and bent over backwards to let them produce additional evidence. What did the judge say about the public factors? He said that the public factors, several of them were not raised by either party, and so they were not considered, but he found, he said, this case has more to do with Israel. It affects Israel, the events occurred overseas more than they did in the United States. From that, you can draw that, by events occurring in Israel, do you mean that the agreements involving commissions and things like that? The agreements, the properties were, as you mentioned, in Ohio, money was sent to Pennsylvania, and there were properties in New York. And there were coal deals that involved coal being sent from West Virginia to the Ukraine. Time is up. Mr. Elliott, thank you very much. Mr. Marks? Let's go in the reverse. We argued every public interest factor. No public interest factor was ignored by us. The burden of proof was on him. He didn't prove congestion. That favors us. Issue of law. The case is governed by U.S. law, Pennsylvania law. There was no argument the case was governed by Israeli law. That favors us. Even if the Israeli law of fiduciary duty applied, their experts said it was the same as our law. Under Pennsylvania conflict of laws, which the federal court would apply, if there's no conflict, you apply the local law. The events, Judge Fuentes, as you note, took place in the United States. They took place in Pittsburgh. And this was more than a few isolated incidences of wires going through Mr. Lempster's account. Mr. Lempster was at the center of this. He was the consultant that was employed through Mr. Sapir to buy the property. It was his letterhead that was forged by Mr. Sapir when Mr. Sapir sent the five fraudulent letters from Pennsylvania where he was based to do the transaction. And most of the $6 million of the excess payments either went through his bank account or bank account, which we were led to believe was his. The cold deals were all sourced through Mr. Lempster. All of the secret commissions related to the two cold deals were first paid to Mr. Lempster's account before they were wired to Mr. Sapir's accounts outside of Israel. All of the secret commissions related to Viola were first paid to Mr. Lempster's account before they were sent to Mr. Sapir. All of the secret commissions related to Williams and the refurbishing of the plant were first paid to Mr. Lempster. Pennsylvania had a substantial interest in hearing a case brought by somebody who bought a plant through transactions in Pennsylvania and bought coal through somebody in Pennsylvania who committed fraud. Pennsylvania, the Third Circuit case, says that the United States has an interest in seeing that its securities laws are enforced. The United States also had a substantial interest in seeing that the RICO law was enforced. It's not dispositive. We understand you can still dismiss if there's a RICO action, but that public interest favored us. We sued Mr. Lempster where he lived. Mr. Sapir is entitled to be treated as an American. As an American, the jury would have an interest in hearing claims from Mr. Sapir who, excuse me, Mr. Shulman, who was treated as an American no matter where he resides. The jury also had an interest in determining whether one of their fellow Pennsylvanians committed fraud. Every public interest factor favored us. The fact that the district court was unwilling to engage in the conflict of law analysis, which Lacy and Loney say that she should have, okay, was an error of law. Would you have an answer to Judge Greenberg's question about whether there's a jury trial? There is not. There is no jury trial in Israel. It's a civil law country, and even worse, as we set forth in our briefs, witnesses in chief do not testify. They submit a written witness statement and then may be subject to cross-examination. Of course we understand why he wants to try this case in Israel. He speaks Hebrew fluently. My client, in honor to your question, Judge Barry, speaks neither English nor Hebrew. He's a Russian native speaker. He can't be a Ukrainian citizen because Ukraine will not allow dual citizenship. So when he fled Ukraine because of the criminal threats which are in his declaration, he became an Israeli citizen. There should be no penalty for him for asserting lack of personal jurisdiction in West Virginia because he had nothing to do with that case. I would note, Your Honor, he did not move to dismiss perform non in West Virginia. It's a red herring. I appreciate that. So public interest factors clearly favor us. There's no finding that they even favor the other side except for the error that's made regarding the local interest in the case. Maybe you can touch on it. I know you've argued it very well, thank you. But it's a balancing, as Judge Barry keeps pointing out, which means that you say that there's an error of law, which pretty much is what you have to show when we talk about the deference that's given to the judge in this case. The balancing is fundamentally flawed for two reasons, for one reason to begin with. My client wasn't given, my clients were not given the deference that they're entitled. And either under the treaty, okay, or I'd like to just quote this here. Does the strength of your argument rely on the court's failure to give due weight to the Equal Access Treaty? My argument, if you conclude that the court gave improper deference either because of the Equal Access Treaty or under Lacey, Wynne, and Loney because the court didn't properly assess the reasons for the lawsuit here. Well, that would be an issue of law, it seems to me, if the court did not properly. The court, I'm really sorry to mean to interrupt. It's not an issue of law because the, it is an issue of law because the court said that the only relevant form was the Western District of Pennsylvania. That, in our view, is flat out wrong, that when it's between the United States and a foreign state, you look at the United States as a whole, and the fact that the Warren plant was five miles to the left of the border with Ohio or the coal in West Virginia with ten miles to the south of our Pennsylvania border with Ohio is irrelevant. That was an error of law when she looked at that. One final point, okay, on the witnesses, okay. Our witnesses were real witnesses. They tried to hide what they were doing. We need the testimony of the witnesses of the United States to show that they were hiding what they were doing, that this was secret. We analyzed their witnesses group by group. The partner witnesses live in France and England, okay. They're equally unaccessible in both jurisdictions. They agreed to come here. The witnesses in Malta and Cyprus, they're not subject to the jurisdiction of either court. No matter where we would try the case, their testimony would be taken under the Hague. We have to finish up. I've got some other cases to get to, Mr. Marks. Your Honor, I very much appreciate the extra time that you gave us. And, again, thank you for your consideration. Thank you, Mr. Marks. And, Mr. Elliott, thank you very much. We'll take the case under advisement. Thank you, Your Honor.